Okay, let's see. So you are? I'm, may it please the Court, Your Honors, good morning. My name is Aileen Tabor, and I represent Imperial County Air Pollution Control District. Got it. So just before you proceed, can I ask, how is the other side going to divide the time? Your Honor, I've tried to speak for 17 minutes. I'm here at the Department of Interior at Dr. Cecil Kelly's. Liz lives here from the flood on Watergate, and she's had to speak for three minutes. Although I hope we can move this investigation, if I need some additional time, I'll probably speak to her for additional time. Okay. Great, that's fine. All right, sorry to interrupt you. I'm okay, Your Honor. I just wanted to introduce at the council table, we have Catherine Casey, who also represents the Air District, Mr. Rossman, Tony Rossman, that represents the County of Imperial, and Mr. Mike Rude, the Imperial County Council. And in the audience is Barbara Baird, who represents the South Coast Air Quality Management District, in case you have any questions of the amicus. Okay, great. So good morning, Your Honors. I'm going to deal with the issues of three things, one of them being the standing issue in the context of the Clean Air Act, because I think that best describes why the Air District has standing to enforce the Clean Air Act requirement. And then secondly, Your Honors, I'd like to address the procedural standing issue for the NEPA claims and for the Clean Air Act claims in the event this court determines that the Air District did not bring an enforcement action. And then the third thing I would like to briefly address are two very clear NEPA violations that I think this court can find and rule in the Air District's and the county's favor, but of course I'm happy to answer any questions that the court may have. Well, I've got an initial one based on your outline of what you're going to say. Let's assume this was an APA action, as the complaint seems to describe it. Is there standing under the APA to raise the Clean Air Act claims? Absolutely, Your Honor. There is procedural standing. Procedural standing has two requirements associated with it. One of those requirements is that there be a procedural law. We have NEPA. In NEPA, there is a specific requirement of- Well, I'm focusing on the Clean Air Act claim right now. Yeah, okay. And so under the Clean Air Act, Your Honor, the courts have also determined that the Clean Air Act is a conformity provision of the Clean Air Act. And the injury, in fact, alleged here by the district is that we're in a non-attainment area and this will affect our SIP. Absolutely, Your Honor, that it will interfere with the county's ability to attain healthful air. And in fact, the expected emissions are going to be so significant that it is very likely that the county will never be able to come into attainment. Now, put aside for a second the enforcement action issue. Your position on the APA is that it gives us standing both under NEPA and under the Clean Air Act. Absolutely. Okay. I want to hear- I say that because I want to hear the response of your opponents to it. And it seems to me to be a cogent argument, even assuming you've switched sides in your argument from below. And that was my last question. Did you really argue below that it wasn't an APA action with respect to the Clean Air Act? Yes, we did, Your Honor. It was not? We argued specifically that it was an enforcement action and that we brought it always as an enforcement action. And in fact, if you look at the APA cause of action, you'll see it says NEPA. Only on it, it doesn't say the Clean Air Act. Okay. So let's assume that we conclude that this is not an enforcement action. Should we nonetheless move on to the merits of your Clean Air Act claim because you would have had standing had you pled it as an APA action? Absolutely, Your Honor, because of the fact that the district court itself determined that it was brought under the APA. And the APA provides jurisdiction when there is no other source of jurisdiction for the court. So even if you disclaim that you were proceeding under the APA, we should treat you as having proceeded under the APA? Absolutely, as a secondary thing because the district court itself found that our Clean Air Act action was brought under the APA. It can only be brought under two things. It's either brought as an enforcement action. No, and I agree with you. Here's my difficulty. I guess I want to stand up for the district judges, Judge Smith. Once again, the district judge in this case, you said to him, don't worry. This is not an APA case. This is an enforcement action, and the judge concluded that it was not. Now you're saying, well, it really doesn't matter because it was an APA case in any event, and the judge should have understood that. Well, actually, Your Honor, we had no hearing, so I never had the chance to tell the judge that. What ended up happening in this case is that we filed our opening brief. The federal defendants raised the issue of standing in their opposition. We responded to those claims saying, look, we have an enforcement action here. Well, you did tell the judge that it was an enforcement action. We told the judge it was an enforcement action. We did not say, honestly, in our brief that it was not an APA action. Okay? We never said that in our brief. We thought we were being clear that we were raising it as an enforcement action. Then what ended up happening is there was a reply brief that was filed that said, no, you know, you're raising now this as an enforcement action for the, you know, for the 11th hour. We never understood it was an enforcement action, and the district judge went ahead and made a ruling without ever having a hearing. We thought we were going to have a hearing. The hearing was scheduled, and the district court canceled our hearing. So we never had a chance ever to respond to the claims that somehow we had not ever brought an enforcement action. I've got only one other question on standing, and that's this. Let's assume that you're correct, that you did have standing to raise the Clean Air Act claims. The district court never reached them. Correct? Absolutely. Should we reach them, or should we send them back to the district court? We believe that you should reach those claims, and I believe that the federal defendants in their brief also said that the claims could be reached, and this is why. Two reasons. One is mitigation water to the Salton Sea is going to end in 2017. By the time we went back to the district court and we come back, let's say we come back to this court, we're going to be past 2017. At that point, the sea is going to drop dramatically, and we're going to get to a point where, you know, there's going to be no saving the Salton Sea, and we're going to be, you know, there's not going to be any issues that we're going to be able to deal with. The second reason is there are three facts that this court needs to rule in our favor on the Clean Air Act, and they're very simple facts. The first fact is that the federal government does not have to do a conformity determination under a narrow exception, and that narrow exception is when the emissions do not exceed what is called the de minimis level, threshold level, okay? And in Imperial County, the de minimis threshold level is 100 tons a year of PM10, and PM10 is a fine particulate. Now you're discussing the merits of your Clean Air. Yes. Okay. And that's fine. If you want to talk about the merits of them, tell me why the federal government has directly or indirectly caused the emissions here. Absolutely, Your Honor. That's a very good point. What has ended up happening is that there used to be the seven-party agreement, which was an agreement. Yeah, I think we've all read this enormous record and understand parts of it. Okay. So what ended up ‑‑ so what I would urge Your Honors to do is to look at Exhibit B to the Colorado River Water Delivery Agreement. That exhibit is what sets forth all the changes that the federal government made to IID's water delivery. So the federal government, for example, said IID used to get 3.1 or 3.2 million acre feet. We're now going to have you transfer water, and you're going to be deducting water from your cap. That's over 400 to 50 to 500. Did the federal government ever tell IID how to use the water? Absolutely, Your Honor. In the Exhibit B, there is a column that says exactly where the water is going to go. One place that the water is going to go is the mitigation water to the Salton Sea. So they directly identified that the water is going to go there. Remember that ‑‑ But wasn't that IID's? In other words, is there some argument here that the federal government said to IID, you may not use this water for the Salton Sea, as opposed to IID coming to the federal government and saying this is the way we propose to use the water? Let's assume that the IID came to the federal government and said this is what we want to do. It required the Secretary's approval for how that water was going to be used. And specifically in the EIS, the Secretary said, it says, the approval of the Colorado River, the execution of the Colorado River Water Delivery Agreement is approving the Quantification Settlement Agreement, which is 35 or so contracts. So the Secretary herself, and at that time it was Secretary Norton, specifically approved where the water was going to go. It's important to remember that the federal government is the one that set up the Salton Sea as the repository for the agricultural runoff. So the Secretary knows when it delivers X amount of water to Imperial County agriculture land, exactly that the water is going to be runoff. That's what was planned. That was the whole plan for that. And the Secretary herself approved mitigation water to go to the Salton Sea. They also approved what the conservation actions were going to be that was used. They were going to use fallowing of farmland in the early years and then changes. Is it your position that the Secretary, Secretary Norton in this case, directly or indirectly caused an increase in emissions? And if so, which of the two? We believe that it can meet both tests under conformity, the direct and the indirect emissions, because the Secretary was specifically taking an action that resulted in emissions at the Salton Sea, because the Secretary decides how much water is going to go on to Imperial Valley farmland. And that has a direct relationship to how much water is going to go into the Salton Sea. And remember that the same Secretary had an obligation under congressional bills to restore the sea, considering the fact that there was going to be less inflow going as a result of the water tramps. So your position on the Clean Air Act issue is that the Secretary, the government, you're not saying the government is directly or indirectly causing increased emissions. Absolutely. But, Your Honors, you don't need – I think your better argument is on indirect as opposed to direct. And the part of the indirect standard that I'm a little confused by is that I thought it requires control or practical control. Right. And the level of the Salton Sea seems to depend on so many different kinds of things. I'm wondering how it is that Interior controls the level of the Salton Sea by virtue of this action. It seems like – what about other mitigation measures? What about other kinds of factors that affect the increase and decrease in the level of the Salton Sea? Well, remember that the Interior did an environmental impact statement and an EIR-EIS. And in that document, they concluded what the effect was going to be on the Salton Sea as a result of them approving the Colorado River Water Delivery Agreement. So the EIR-EIS itself says we're going to have an impact on the Salton Sea. But, Your Honors, I think if we could back up on the Clean Air Act, there's actually – you don't even need to get to that level of detail because the Clean Air Act requires that there be a conformity analysis. And what we're talking about is post hoc attorney argument that was in a – Well, but it only requires – I mean, this is one reason why we might want to send it back to the district court. If you're talking about post hoc arguments. But it only requires an analysis if the secretary directly or indirectly causes the problem. Except for that first you have to do a conformity analysis to make that determination. That was never done. What ended up happening was the – in the EIS, they used the 100 tons a year de minimis level as the threshold of significance for air quality impacts, okay? And then the EIR-EIS that they tiered to said the air quality impacts are significant, meaning – for the Salton Sea, meaning that the emissions exceeded the 100 tons a year standard. When that happens, you're required to do a conformity analysis. And then you do the kind of analysis, Your Honor, that you're talking about. You make an analysis. There's a specific methodology in the conformity rule in Rule 925 that you're supposed to use. Well, 925 is a state rule. It is two rules. It is both a local rule. It is also federal law because it's been approved by EPA and has become part of the federal – But to the extent that 925 exceeds federal standards, which do we enforce? You would enforce the federal standards, but 925 does not exceed the – So they're the same? They are almost the same. Okay. So it's federal law that we're – It is federal law. It has been approved by EPA as being part of the federal law. So, Your Honors, you don't even need to get into the minutiae of that issue because of the fact that you're required to do a conformity analysis when you exceed the de minimis threshold. The threshold by their own document admits that it's been exceeded. There is no conformity analysis. It should be a decision in the favor of the Air District and the county because a conformity analysis was never done. I'd like to make sure that I reserve enough time, but I do want to hit if it's okay just briefly on the tiering, two of the NEPA issues, one of them being the tiering issue because I think that's a very important issue. The EIS tiers to 19 non-NEPA documents. Does it tier to them or does it incorporate them? The language? Put aside the language because after all, if it said it incorporated them or said it was tiering and we thought it incorporated them, this is an issue of law, is it not? It is absolutely an issue of law. So put aside the language that the government may have inadvertently used or purposely used. Why is it tiering as opposed to incorporation? Because of the fact that you have to go by what the evidence is in the record and the evidence in the record says that the document tiers to. Well, now you're talking about the language used. Forget the language for a second. Let's assume that they hadn't said anything. What in this record tells me that they tiered rather than incorporated? When I look at the record, I see each of the documents, not simply referred to in the EIS and say we're tiering to this. They're there. You know, everything was done that would have been done had they been incorporated by reference. So what's the harm from the use of the language? Okay. Well, actually you're raising a very important point. I'm glad you raised that because it turns out that nine of the documents that were tiered to and incorporated are not in the record. They're not there. They're missing. They were not available. These nine documents were never available to the public, and we cited the pages in our brief, so nine of the 19 were never available. What the harm is about tiering is that you tier to a document that doesn't meet the NEPA standard. These documents were not NEPA documents. They were contracts. In fact, one of them is the QSA, which is the document that the secretary says she approved. It's not in the record. The federal defendants have taken the position that if a document isn't in the record, the federal government didn't consider it. So how can you have 19 documents, whether you want to call it tiering or incorporation? Aren't a lot of these documents statutes and other kinds of documents that are readily available? No, they're not, Your Honor. They weren't statutes. They were things such as the Coachella Valley Management Plan, EIR. I'm sorry, yeah, the EIR. One of them is the Quantification Settlement Agreement itself. One of them is a Habitat Conservation Plan. There's 19 of them that are listed on the pages that we cited for you. And the harm is that all of a sudden you're tiering to documents that don't meet the NEPA standard, and they can't be challenged under the NEPA statute. So that, we believe, is a problem. And I want to just briefly raise the issue of incorporation by reference. I want to make sure I leave enough time for rebuttal. But I think that's equally an important issue because whether you want to call it tiering or whether you want to call it incorporation, this EIS incorporated an EIR EIS that the Bureau and IID prepared that is not approved. It has no ROD. There's never been a record decision for it. So that document cannot be directly challenged. And it has in it all the indirect analysis associated with a salt and sea, so the decision makers don't have the cumulative effect in front of them. I mean, how can we have a document that's incorporating an EIS and there's never been a ROD for that action? And remember that under NEPA, the Secretary's not supposed to be taking any action until there's a ROD. And half of the analysis has no ROD. Can I interrupt you for a second? Absolutely. You've got an enormous amount of ground to cover here. But I've got a question on the NEPA stuff. Absolutely. It's sort of a 30,000-foot question. California was getting too much water. The Secretary said, you know, the law says you get 4.4 million acre feet per year. You've got to get less. Come up with a plan. And the seven parties come up with a new plan. When looking at the environmental impact, the Secretary says there's two alternatives here. One is this plan, and one is no plan at all. And if there's no plan at all, I have no idea how they're going to divide these 4.4 million acre feet because that's up to them. It's not up to me. But I will restrict them to 4.41 million acre feet per year. And when you work the math, it means IID is going to get substantially less than it gets under this agreement, under which the Secretary continues the fiction that there are surpluses along the river. Given those two alternatives, how is the Secretary of use discretion in concluding that the first one is better than the second? Well, let me back up to actually what the Secretary did because remember that it's not IID that takes less water. IID has the third highest priority. I understand, but I guarantee you if the state of California only gets 4.4 million acre feet per year, that IID will get less water than it gets now. This record is playing on that. So the question is, given those two alternatives, one alternative in which it gets as much water as it was getting now and it slowly moves down to the 4.4, or one where it immediately moves down to the 4.4, how did the Secretary abuse discretion in figuring that the graduated plan had less impact on the environment than the immediate plan? Well, the Secretary, first of all, should have considered other alternatives because remember that we're talking about... Thank you, because this is the point I'm trying to get to. The alternatives require that seven parties reach an agreement. Right. Because in the absence of that, the Secretary, I assume, says, well, your water is here, guys, come and get it when you want it because it's not my job to divide it among you in the absence of an agreement. So as a matter of law, why should we say the Secretary has to consider something other than action or no action? Because of the fact that there are other alternatives. San Diego itself could do desalinization, could look at further conservation activities. So there are other things that can be done. And remember that the Secretary isn't sitting back and saying, oh, I'm going to let you turn your side. No, the Secretary forced everybody into this agreement. We understand. Absolutely. And the Secretary herself said, this is where the water is going to go. I'm taking the pie of water. I'm dividing it up. She said, if you look at Exhibit 2, Exhibit B, I'm sorry, to the Colorado River Water Delivery Agreement, you'll see the columns of where the Secretary said, this is where the water is going to go. But my difficulty with that is what the Secretary said. If you look at this record, you guys better agree as to where the water is going to go. Because if you don't, I'm going to cut the spigot off right now to the amount that you're actually entitled to under the law. And they fought for a long time. And the seven of them came back to the Secretary and said, we've reached an agreement. This is where the water is going to go. The Secretary said, bless you, my children, and approved the agreement. But that isn't what happened. The Secretary was very involved. The Secretary didn't step back and say, this is what's going to go. Because the party that would take less water under the seven-party agreement is Metropolitan Water District, not IID. And so the Secretary was there saying, more water has to go to Metropolitan and IID. You're the one who has to give up the water to make that happen. Well, but I've worked the numbers, and tell me where I'm wrong. If you go down to 4.4 million acre-feet per year, IID loses right away 300,000 acre-feet, doesn't it? No. Isn't that one of the unspecified allocations under the agreement, as I see it, is about 300,000 acre-feet per year, for which there's no water available, under the previous seven-party agreement, right? No, but it's Metropolitan. They're the ones that have the last priority. What ends up happening is – Well, I understand they have the last priority. But when you cut a million acre-feet a year out of it, out of the allocation, under the old seven-party agreement, and you just work down the priorities, you don't lose any water at all? No, IID does not, because they have Priority 3A. If you look at the seven-party agreement – I am looking at it. And I have it in front of me as well. If you look down at what ends up happening is, the Priority 3.85 goes to Palo Verde, Yuma, and then it goes to IID, which has a senior right over Coachella Valley. And then – Yeah, that's right. And that gives a total of – so how much were you getting under the old agreement? So what they were getting was any amount that they wanted, as long as they didn't exceed 3.8. So in some years, they used 3.1. In some years, they used 2.6. In some years, they used 3.2. They used more than the 3.1. And what ends up happening is it rolls down. So whatever's excess then would go down to Palo Verde. And then it goes down to Metropolitan Water District. And you can see that Metropolitan Water District 4.4 is up to Metropolitan's half of what they normally were getting. Wasn't IID and Coachella collectively receiving 330 million acre-feet per year under the old agreement, under a priority that would have got knocked out under only 4.4 million being – Their priority would not be knocked out because they have the higher priority. How it works in water law is that you go down the priorities. The water gets delivered. And so they go first to priority one and say, you take everything you need as long as it's not more than 3.85. Then it goes to Yuma. Then it goes to IID. Right. And I think I understand all that. But as I look at the agreement, there's 4.4 million allocated on priorities higher than the priority that went to IID and Coachella of 330 million acre-feet per year. Am I wrong about that? Yes. It's actually 3.8 million. And they get – Right. And then Metro gets 5.5. And they get 5.5. And that's 4.4. That's 4.4. So then if you look at the very next line, okay, which is Metropolitan Water District at another 5.5, that is where the excess water is. So if the secretary says, you're going to get 4.4, that's the end of the story, the person who ends up losing, the entity, is Metropolitan Water District because they have the 5A priority that is not within the 4.4. This is – I know you're over your time. This is important to me because I read the agreement differently and I want people to help me on this. I'm looking at the priorities. Is there a 6A priority for IID? Yes. And that's 300,000. 300,000. Okay. 330, I have. Yes. You wouldn't get that. Absolutely not. Okay. But they haven't been getting that anyway. They haven't gotten that anyway. Because remember that they're getting – they're all taken care of by the 3.85. So they don't – They haven't needed it. Right. So it's gone to Coachella. Right. No, it doesn't go to Coachella. We never get down to that. Never get down to Coachella. Right, because as far down as you get is to 5A, which is Metropolitan Water District. Okay. So my second question is if priorities – as I see it, priorities 1 through 3B are all just massively quantified as 3.850. Exactly. And so the quantification settlement agreement, part of it was to say how much is everybody going to get out of that 3.85. Okay. In the absence of the quantification settlement agreement, just going back to the previous seven-party agreement, how would it be allocated? If it was only 4.4. Okay. So then what would end up happening is Palo Verde would get as much of the water as it wanted under the 3.8. Then it would go to Yuma. Right. Then it would go to IID. Right. Your priority 3A. Exactly. Then it would go to Coachella. Then it would go to Metropolitan in its 4 priority. And then if there was – let's say that – But let's assume there's only 4.4. There's only 4.4. Other people have higher priorities to the water than you do. Absolutely. Palo Verde and Yuma. Yes. They have higher than IID. I'm not representing – Yeah, IID. Then Imperial Valley. Yes. Because you're making a derivative claim. You're saying if IID only had more water, we would have more water. That's true. I mean, again, you've got to remember that the – okay. Okay. So part of the reason that the new agreement was required was that Arizona was using more than it was before. Right? Absolutely. Yeah. And that's Palo Verde and Yuma. They're using more on their priority. It doesn't affect this 3.85. But what was happening was there was surplus – what's called surplus water. It was water that Nevada and Arizona were not using. Right. And so the Secretary was able to deliver more than 4.4 to Kalamazoo. I understand that. But my question is if you would not be guaranteed the same quantity of water under the seven-party agreement that you get now if the Secretary had restricted the total amount to 4.4 million acre-feet per year, would you? No. We would get the same amount. That assumes that Palo Verde and Yuma would not use more than they did before. But Arizona, the excess that we're talking about that Arizona and Nevada are taking is not the Yuma. That's a different thing. This Yuma water is different. I understand. But they have a higher priority than you. Right. But remember that that water that they weren't using is not reflected on the seven-party agreement because it's not part of the seven-party agreement. They have a separate agreement with the Secretary. I think we're talking past each other. Okay. Palo Verde and Yuma have higher priorities than IID. Yes. Assume there is no surplus water available to get past 4.4. Yes. If they use more – does their priorities allow them to use more water than they're using now? Not really because of the fact that the water that's being served to Yuma and to the Palo Verde project is to a very specific number of acres. So it has nothing to do with the fact that Arizona has its Central Valley project. That Central Valley water project is not coming out of the Yuma amount. This is specific to acreage that's in Yuma and to Palo Verde acreage. It has nothing to do with that. So your position is the allocation to Palo Verde and Yuma under the seven-party agreement is fixed? It's pretty fixed. It's fixed. Pretty fixed or fixed? I think it's fair to say it's pretty fixed because in some years you use a little bit more water and some years you use a little bit less water. But we're not talking about a dramatic variation. It's pretty consistent the amount of water that IID was taking, you know, somewhere between 2.7 and 3.2 because they have that because after you get Yuma and Palo Verde, you know, they're only, I think it's like 100,000 acres that they're irrigating or something like that. There's a specific amount that Yuma and Palo Verde are irrigating. So that's where the variation is how much they need. So then if I can bring this back, and I'm sorry to take you over time, but that's life. Your position is that the no action doesn't hurt you. Right. So if the no action doesn't hurt you, why does action hurt you? Because of the fact that the amount of water that IID is going to be getting is far less. It's between 450 and 500,000 acre feet a year less. Less water going to the fields, less water going to the Salton Sea. And what's going to happen to the Salton Sea? It's projected to go to negative 250. So you're not really arguing that the secretary erred by not considering other alternatives. You're arguing that the alternative that the secretary chose is more harmful to the environment than the one that she didn't choose. No, Your Honor, we're not arguing that at all. Because the secretary, obviously, once the secretary has all the information, the secretary could make the decision that the secretary wants. What we're arguing is the secretary did not make an informed decision. The impacts associated with the Salton Sea were in another document. I just wanted to make sure I understood the priorities argument. Okay. We'll give you time for rebuttal. Okay. We will hear from the other side now. Great. And if need be, we'll give you a little extra leeway since we gave counsel for the point of extra leeway. May it please the Court, my name is Peter McVeigh, and I'm here on behalf of the Department of the Interior and other federal attellees. With me at counsel table are Robert Snow from Interior, Steve McFarland from the U.S. Department of Justice, and Michelle Ouellette from the Coachella Valley Water District. Of course, Coachella is one of four California water agencies that intervene as defendants in this action. I plan to speak, as I mentioned earlier, for 17 minutes. Your Honors, this Court should affirm the District Court judgment in favor of Interior. This is a challenge to Interior's final agency decision to approve the Colorado River Water Delivery Agreement. This agreement had an important but a limited purpose. It provided the federal approvals necessary to implement changes in water delivery points and amounts pursuant to a suite of consensual and historic agreements that came to be known as the Quantification Settlement Agreements, or the QSA. Back in 2003, the QSA answered the very important question for California and other basin states of how California would reduce its historic overuse of Colorado River water. A key feature of the QSA is the conservation of water that's used in connection with irrigation activities, that the bulk of the water that's conserved is transferred to the entities who pay for the conservation measures. The need for the Colorado River Water Delivery Agreement and federal approvals arose from the fact that the QSA cannot be implemented consistent with the 1931 agreement, the priority system established under that agreement, and that priority system is also reflected in the water delivery contracts under which Interior delivers water to the California water agencies from the main stem of the Colorado River. As I understand it, Interior had the option of simply saying, we're at 4.4, we'll deliver 4.4 and you all can allocate it according to your previous agreements. And I take it what the other side is arguing is that that would have left the Imperial Valley in status quo and that would have been a good thing. Why? Respond to that if you would. Your Honor, and these questions, this conversation is very understandable because this is a very, very complicated situation. The law of the river itself is complicated and these agreements are complex and measuring these impacts was a very complicated process that Interior and the California water agencies took very seriously. I think the starting point is that there's a, you know, of course there was, the QSA had a kind of a genesis or a beginning and it wasn't Interior demanding these water transfers. I mean, this path began back in the latest 1998 when the Imperial Irrigation District and San Diego reached, you know, voluntarily reached an agreement to transfer water, you know, to conserve water in Imperial Irrigation District service area and then transfer that to San Diego. And I'm going to ask you a question about, there was a transfer EIS in this case. That's not an issue in this litigation, is it? The transfer EIR or EIS is an issue. Is it? Are they attacking the EIS procedurally or merely by virtue of its incorporation into this one? I think the best way for me to address that is to step back a little bit and talk about it and just talk briefly about what Interior did because there were two and this is unusual but there were two final environmental impact statements in this case. Interior prepared the final EIS to address primarily the impacts on the Colorado River from this agreement. These are direct impacts, changes in flow on the Colorado. You're going to divert the water farther up in some sentences. Exactly. And the plaintiffs haven't challenged that discussion of impact. What the final EIS also did was discuss indirect impact in the service areas of the California Water Agencies including the Imperial Irrigation District. And so it also discussed the salt and sea. Interior had started a joint environmental review effort with Imperial Irrigation District. Before it, it started the final EIS just to look at the water transfers. And they carried that forward. And it made sense that, you know, it's very reasonable to do that. Imperial Irrigation District has obligations under CEQA, the California Environment Equality Act, of course, essentially is NEPA's state law counterpart. And so Imperial partnered with IIT to address these particular impacts. What they did in the final EIS was they summarized the indirect impacts from the service area and they incorporated by reference more detailed discussions of impact. This is why I ask the question is that the transfer agreement, if you will, in effect removed 300,000. Worst case was that 300,000. Million acre feet per year mapping. And what's the worst case for IID under the agreement that the secretary approved? The worst case for IID and I think you mean the worst case water transfer was this 300,000. Well, that's what I'm asking. It seems to me that if the transfer agreement was okay. And I'm, you know, I'm using okay in its federal sense that everybody did the appropriate thing. Was there any additional harm inflicted on the appellants in this case by the approval of the CDRWA? Isn't what they're really complaining about is that they're losing 300,000 acre feet of water? Yes, and that is the basis for most of their claims here because of the impacts or the potential impacts on the salt and sea. That's correct, Your Honor, although. I'm not sure it gets you off the hook. I'm just trying to segment this case. That seems to be the real complaint. The real complaint is that San Diego is going to get more water under the new status quo and IID is going to get less. Right, and the, you know, the transfer agreement was a, there were state law proceedings about the transfer agreement and there were objections actually among, you know, these agreements resolved numerous longstanding disputes about the use of Colorado River water. I mean, this is historic and very important. And there were disputes over that. And I don't think the California water agencies all agreed that IID and the San Diego's, you know, Imperial and San Diego's agreement could go forward. And, again, this is another fact that kind of shows what an interior's role was in this. This was a dispute under state law and there was actually, there were state law challenges to that agreement by some of the water agencies. The interveners here did not, you know, we, not everyone's always disagreed about the use of Colorado River water. I mean, one of the, you know, again, one of the historic things about this agreement was that it brought everyone together. So, and part of that has to do with the priority system, the 1998 agreement. San Diego doesn't have a, you know, a right to divert Colorado River water under the 1931 agreement. It's jumping over other people, other entities that have higher priorities. So, there were disputes over that agreement and that's eventually what kind of led to the QSA. But it was never interior driving that. Interior didn't force San Diego and Imperial County to reach that agreement. They reached that agreement and it was incorporated into a plan developed by the state, the California plan that we talk about in our brief. That all preceded, what interior eventually did, which was significant was that it promulgated the interim surplus guidelines and that provided what we refer to as the soft landing for California. There was a concern about California, or maybe an acknowledgement that California would have difficulty just coming down to 4.4. Couldn't get off the heroin immediately. And so, the secretary said, well, we'll, we don't care whether there's actual surpluses on the river. We'll treat it as if it were over time so we can bring you down. We can get you, you don't have to go cold turkey. And acknowledging the risk that that posed to others who rely on basement storage, interior, you know, required that the agency reach an agreement, a long-term plan by the end of 2002. And that was the nature of interior. I have a question that neither party has answered in this case. I think I know the answer from the EIS, but let's assume that the parties hadn't reached any agreement. And the secretary had said, well, then I'm going to enforce the law as it's written and you get 4.4 million acre feet per year. How would that water have been allocated? Yeah, and it's an interesting, and again, very complicated question. And I think the best way to address it is to discuss what interior did in the final environmental impact statement. No, I understand what finally happened. My question is, let's assume no agreement. Would the water have been allocated under the previous agreement? Isn't that the seven-party agreement? Essentially, yes. Yeah, and interior has a, you know, there's 43 CFR Part 417 regulations and interior takes water orders and it ultimately delivers water. And it would have, essentially, it would have been reverting to, you know, the prior scheme and interior would have made surplus determinations as it did in the past. And interior thought very carefully about this is essentially a no-action alternative, right? What if interior hadn't approved the QSA? Interior thought very carefully about that. And again, these were very complex modeling that went into what would happen. So let's go back to the NEPA issue, because as I understand the EIS, the interior says, well, we've considered environmental consequences from no action and we've considered environmental consequences from the action that we're contemplating and the environmental consequences under no action are worse than the ones now, correct? Than the ones that would occur under this agreement. Is that a fair summary of it? I don't think, no, I think there actually, there are significant impacts we, you know, interior acknowledged as a result of this agreement. And I understand what you're, I understand. Is the no action, see, that's what I'm, as I read the EIS, it says, this is better than no action for the environment. Am I wrong in that reading? Well, I don't, I would, I don't think, believe that that was a conclusion. Or just that we've considered both, we can quantify them and we opt for action. Yeah, and the NEPA inquiry isn't concerned, of course, with, you know, the substantive outcomes or the ultimate decision, it's the procedure. And what Interior did was, and again, these are very complicated, the impacts, but there are impacts from implementing this agreement versus the no action. Again, there are things that would have happened under the no action alternative that, you know, obviously would be very undesirable and including, you know, some environmental ones. But there were. San Diego, San Diego drying up, for example. Yeah, there were, you know, there were impacts. But I think the ultimate thing that and what Interior was required to do underneath was to discuss the impacts. And that's why I went through this trouble to develop this no action baseline. I mean, there's a complex modeling that went into that and a lot of thought to understand what would happen if, you know, if we. So are these the only two alternatives that should properly be considered? That's where I was sort of going. Is no action and action the only two reasonable alternatives to consider? Because you can't do anything otherwise without the agreement of seven parties. And that is our position. It's a little bit more complicated, I think, than just saying that Interior only considered two alternatives because there was also obviously a comprehensive kind of gold-plated mitigation plan they had considered in the final EIS, which would have reduced impact. So that was another. Let me ask you about that because one of the arguments that Council didn't bring up this morning is that there were significant post-EIS changes that really required a supplemental EIS to be prepared. Obviously, Interior didn't conclude that wasn't necessary, but maybe address for me why some of those changes that seemed quite significant didn't warrant a supplemental EIS. So, Your Honor, the plaintiffs had raised two claims. First, there's the use of the environmental evaluation. I don't think that's what you're asking about. We explained why that was permissible and also the ultimate conclusion. And the reason why no supplementation was required here is that even with these minor changes, the impacts of the Colorado River Water Delivery Agreement, the indirect impacts, were within the range of what they considered in the final EIS. They were between no action and action. Exactly. Between no action and action without the gold-plated mitigation plan. And the final EIS analyzed a scenario under which 300,000 acre-feet per year of water would be transferred by IID without any mitigation, and that was fully disclosed in the EIS. What happened after that, there were further negotiations on the QSA. I mean, one of the useful things about the environmental process was that, you know, they got public input at a time when the negotiations were ongoing. But naturally, the negotiations continued, and there were some minor changes made. And Interior carefully considered those. The two major changes, this one involved a, I mean, when I say major, I mean most relatively. One involved a more gradual ramping up of the water transfers. That's actually a beneficial environmental impact. That brought it back more towards the no action or the mitigated scenario. And likewise, Interior added a, it wasn't Interior that added, it was actually the State Water Resources Control Board, but there's a 15-year mitigation plan. That lessened environmental impact. Now, on top of those things, there were some minor changes that reduced the water that in certain years that would flow to IID, and therefore there could be slight increases in impacts on the Salton Sea. But those weren't impacts of a different kind that would have been useful to discuss, and nor did they, you know, bring the impacts back, you know, past what Interior had proposed. Past the two baselines considered. Right, between the goal posts. So, but describe for me then why, because they did change, they did present something in the middle, why a supplemental EIS wasn't needed to address those. Your Honor, I think the agency would have had the flexibility, even if it wasn't required as a legal matter to do that. But Interior decided not to do it based on its conclusion that, again, these were minor impacts, and within the range of impacts disclosed in the final EIS, I think the, you know, the benefit of additional public comment, I mean, these agreements, they received extensive public comment on these impacts, and including this scenario where there was no mitigation. So, really, there would have been, you know, there would have been little value to. I'm searching for the legal principle here. Is the legal principle that they were within the range of impacts considered in the final EIS? Right. And so, of course, the CEQ regulations talk about substantial changes in the action. And, again, some of the changes I've described are a lessening of environmental impacts. And I think the Court could also consider that, you know, it's important. I mean, if the Court were to rule here that Interior was required to do a supplemental environmental impact statement, I mean, that could encourage agencies not to make then changes that are beneficial for the environment. I mean, if Interior had to go back and stop, essentially, it would have, they would have had to hold up the implementation of this very important agreement. If they had had to have done that, they were within their rights under NEPA just to adopt the worst case. They had no, there was no requirement under NEPA for Interior to adopt mitigation. And I think if this Court were to rule that Interior had to make a, you know, had to come out with this supplemental environmental impact statement, that actually would create incentives for agencies to not to make these kind of beneficial changes. And, again, there were a number of small due to the negotiation changes, but Interior had modeled those. And, you know, the impact that would have been presented in a supplemental EIS wouldn't have been impacted of a different kind or a different magnitude. The approval came, though, with the, as I understand, at the time, with the understanding that there were going to be substantial mitigation efforts made to ensure that water would get to the Salton Sea. And by the time, am I wrong in that, that the initial plan that was in place just got scaled way back and there was actually a provision made that additional waters that were supposed to go to make their way to the Salton Sea were going to be able to be sold instead? So there was a draft, you know, a draft environmental impact statement and then there was a final environmental impact statement. The final environmental impact statement acknowledged that this comprehensive mitigation plan, which went beyond just the impact of this action, it actually addressed ongoing activities in the service area of the Imperial Irrigation District. It disclosed that that, you know, that mitigation plan might not be implicated, might not be implemented. It wasn't a, you know, Interior, it wasn't that Interior had just considered the impacts of the project with the mitigation. It also considered without any mitigation. And so when Interior ultimately shifted, when, and it wasn't Interior, again, it was, these were negotiations among the California Water Agencies. They, Interior is not, the mitigation we're talking about is not being funded by Interior. It's funded by the California agencies and the state. When that went forward, the, you know, they were, they had fully disclosed and the public was on notice in the final EIS that that gold-plated mitigation plan might not be implemented. And it was a source of substantial public comment, the impacts on the environment from the, you know, the proposed action without mitigation and the proposed action with the gold-plated mitigation plan. But again, the EIS was very upfront and they, the plaintiffs had made a big deal over the, you know, the change to a Section 7 approach for Endangered Species Act compliance. And again, that was, that was disclosed in the final EIS. That was all disclosed. Go ahead. Well, I'm still, I want to go to Clean Air Act, but I do want to ask you a more deeper claim. I'm still trying to get the legal principle that we ought to apply when changes to a final EIS are substantial enough to require a supplemental EIS. And I think the answer can just be, you know, and I don't think the court has to address all the possible, you know, implications that could, that can happen, you know, factual scenarios here that could happen because there could be, I mean, there can be impacts that come up that are of a different kind considered in the EIS. But I think the language we cited in their CEQs 40 questions could be helpful here and it describes an obligation to supplement a draft EIS, but it's interpreted in the same CEQ regulations. And that talks about when the, you know, the environmental impacts are qualitatively within the range of, you know, alternatives that were considered in the EIS. Qualitatively is the word. Okay. And here, we were clearly within those impacts because we discussed this worst case scenario where water would completely be, all the water would leave the Imperial Irrigation District and be essentially sent to the coast for urban uses. We disclosed that worst case and, you know, the supplemental EIS, again, the value of that would have been pretty, you know, would have been minimal. The public already had an opportunity to comment on, you know, these kinds of impacts from this worst case scenario. And this just, and again, it's in the interest of the court doesn't want to, won't want to create incentives for agencies not to make beneficial changes. I think you've answered my question. And I know Judge Watford was going to ask you a Clean Air Act question. And I was going to too. Okay. So let's just start. What is your position with respect to standing? Do you basically want us to reach the issues under the APA? No, no. The court should reach standing. The court can affirm based on standing. So wait. Okay. So do you, you're not contesting that there would be standing under the APA. You're just saying that that's not the action they brought? Well, I think we would contest both. But I think our primary position here is that the plaintiff should be. We've reviewed these conformity issues under the APA before. So why are you. Yeah. So let's assume that their complaint said, this is purely an APA action. And we want review of the NEPA decisions. And we want review of the CAA.  We would, Your Honor. Why? Why? Well, there's an obligation to come forward with specific facts. Well, I. They have a burden. They have a burden to demonstrate standing in the district. You know, actually, I think our. But our primary argument is the court shouldn't get there. I mean, their argument on standing that was before the district judge was that they had fled an enforcement action. That's what they put. That was their argument. And the district court addressed it. And I don't think they. You know, we don't. Our position is that they shouldn't be able to go back and now make this APA argument. I mean, we certainly put them on notice of their burden. We moved for a summary judgment on this issue of standing. And they had a burden under Summers, the law, and these cases. They have a burden to demonstrate their standing. But didn't they submit. I'm trying to remember the name of the party, and I'll find it, but it's not important. They submitted an affidavit that described that they were an unattainment area, that they had SIF obligations. And that and this would this would cause a problem for the air pollution district. Why isn't that enough? Your Honor. That there was in their district court. And again, this is it's 1813 to 1816. That's the experts record. That was their district court commission. They have a single string. They didn't identify any sovereign or proprietary. Now, put us away. Put away. I don't buy the argument that we're the government and therefore we get to sue. They had a very specific argument that they're making to us. Whether or not they made it well below is a separate issue, which is that we're the air pollution control district. And we have obligations under the SIF to control air pollution. And this is going to make it worse. Why isn't that enough for standing? Right. And, Your Honor, that argument wasn't articulated in the district court. If it was articulated, would it demonstrate standing? It would still be problematic here. And I'll explain why. The air district is actually represented in, I mean, it has an unattainment plan. It developed an unattainment plan in 2009 specifically for particulate matter. And it actually represented to EPA that what was happening, the mitigation requirements for salt and sea emissions that were incorporated into the state permit of IID were adequate to address the emissions. And they secured EPA's approval in part. I mean, they've also. Yeah, but maybe they changed their mind. Maybe now confronted with reality. They've said, oh, my God, we can't meet attainment under this new situation. Why doesn't that get them standing? And, Your Honor, and I think it sounds like you're not agreeing with our point on the specific facts, but I think that is an important point. Well, no, I take it your point is they never really said that to the district judge. And they don't get to say it to us in the first instance. And I think even if you mine through the declarations, I mean, their absence of making that assertion in the district court papers is significant. They, you know, if you look at the data they're presenting in their declaration, I think you're referring to the Poirot's declaration. There's some air quality data. I mean, that's from a time when these water transfers are being mitigated, right? There's a 15-year mitigation plan. That's not an effect of the Colorado River water delivery agreement. And I think when you put that together and they haven't explained their, you know, they're required to do mitigation under state law, I mean, they're kind of, in court here, they're alleging some threat to their. Yeah, and look, I take your point about the absence of stuff in the record below. Here's my difficulty. I don't think we can combine standing with the merits. In other words, this is an entity that's required to monitor air control, monitor pollution control in this area, and they're alleging that pollution will increase under this and it will make it more difficult for them to do their job. Whether they're right or wrong doesn't really matter for standing, does it? And, you know, I think at a summary judgment stage it could be significant. I mean, the district court, this is supposed to be put before the district court so it can view the facts in the light most favorable to them and then make a judgment. And that never happened here because they didn't present it. But I understand your point, and I'm glad you brought it up because it is in our position that an air district can never challenge a conformity determination, and I know they have challenged conformity determinations. And we've reviewed them under the APA. They've been reviewed under the APA. That's the appropriate mechanism to do it, and the arbitrary capricious standard, that's what applies here. Can you, I know you're over time, but I took your opponent over. Assuming this is an enforcement action, why isn't there standing? I think the court, if they, I mean, there are problems with the enforcement action, right? There's no federal cause of action here. They didn't file it under the citizen supervision. Congress didn't give them a right to do it. They're not citizens. I mean, they could. States have used the citizen supervision, but there are other requirements to do that, and they have an argument back here. They haven't done it. There's also the waiver of sovereign immunity issue. The APA gives a waiver of sovereign immunity. It allows the federal government to be sued. And here, again, the APA was the only waiver identified in their complaint, and they don't have a waiver that would allow the federal government to be sued here. Well, there is a Clean Air Act waiver. There is a waiver. It's just this particular action wouldn't be within the scope. Would it not be within the scope because what they're seeking to do exceeds federal standards? Or is it why would it not be within the scope? Well, see, as I understand that waiver, what I thought was being – who knows what Congress was thinking about, but what it appears that they were thinking about was we don't want to subject the federal government to liability for more than what federal standards require. And so you can't sue us. You can't sue us to enforce a plan greater than the federal plan, but you can sue us to enforce the federal standards. Is that a misreading of the waiver provision? Your Honor, we have a slightly different interpretation, and based on that language that says they can – you know, we're only required to comply with – it says federal, state, and local laws to the same extent as any non-governmental entity. And, you know, this conformity, if you look at the rule at issue here, it doesn't apply to non-governmental entities. It's just applying to the federal government, and therefore we take the position that that – There can never be a citizen suit – there can never be an enforcement action to enforce the conformity actions? Conformity requirement? That's right. Because it only applies to the federal government. That's right, but they – I mean, if the Air District could, they could make it apply. You know, these requirements, they kind of asserted that they couldn't, but, you know, other projects could make this kind of determination. They could require other projects to determine whether it would interfere with the SIP. That's not – There can't be an enforcement action to do that, but there can be an APA action if you have standing. That's right. And, you know, Congress is aware that there's an APA, you know, vehicle, and it doesn't always provide a waiver of sovereign immunity and an express federal clause of action and statute. And the APA is there for, you know, for things that aren't expressly provided for. So it's not our position that there can never be a, you know, a conformity challenge. The problem here is that the plaintiffs didn't meet their burden. Let me stop you there because I want to make sure that your colleague has time. If you'd like to address this. Okay. All right. Then maybe you can address – let's assume we get past standing on the Clean Air Act. I'd like to hear – I'm with you maybe on – that's not direct emissions, but on indirect emissions, it seems like. So maybe you can address that in two minutes. And as an initial matter, we agree. We think the court – if the court disagrees with our position on standing, which we think we're right and we support the district court, we think the court shouldn't reach the merits of the conformity claim. Rather than send it back to the district court. Rather than send it back. Okay. It would be the same standard of review if it came back up. It's an arbitrary – We're just reviewing the record. Based on the – We're just reviewing the record. Yes. And we would encourage the court to reach the issue. So two minutes on why these aren't indirect emissions. So Judge Smith had it – you know, had it exactly right on the – there's a control – practical control requirement. It's not just a practical control. It's a continuing program of responsibility. And here, Interior's role is very limited. It's diverting water from the Colorado River. It's not controlling how, you know, the Imperial Irrigation District seeks to conserve water. You know, there are different ways the Imperial Irrigation District can do that. Likewise, it's not a mitigation plan that's been ordered by the State Water Resources Control Board. That's the Imperial Irrigation District, which is ordered to work with the Air District. Interior's not out, you know, monitoring and developing mitigation for this. And there's no – the absence of that continuing program is dispositive here. There's a helpful case we cited in our brief. It's the South Coast Air Quality Management District versus FERC. Again, under that authority, Interior's not required to leverage resources. It wasn't required to hold, you know, hold out or refuse to comply with its contractual obligations now or its obligations in order to, you know, indirectly compel something to happen out in the – out in the Salton Sea. That's not – that's not the conformity. They don't have a program – a continuing program of responsibility. There's also the quantifiable issue. You know, indirect emissions have to be reasonably foreseeable. And part of that is that the emissions have to be quantifiable. And the plaintiffs haven't – Interior analyzed that very carefully. I mean, there was discussion of comparisons between this situation and Owens Lake. Interior thought about the different salt, you know, differences in the emission-driving factors, wind, salt chemistry, other factors. And these are areas where courts, you know, give agencies lots of deference. And here it was thoroughly considered, and Interior determined it was not quantifiable. And the plaintiffs haven't, you know – and I think haven't come forward with anything to suggest to establish that they were. I mean, certainly they were – again, they referred to this Owens Lake scenario where emissions were quantifiable, but Interior really thoroughly explained in the record why this situation was different. And at that time, their decision was made. Okay. We've let you go well over your time. We appreciate your arguments. Can we give counsel three minutes for a little – we were going to hold you to that because we were way, way over. Okay. And I'm going to try to leave a minute for Mr. Rossman to address the standard. I want to briefly address the conformity issue and some of the other things. One of them is the arguments that you're hearing are the arguments that are supposed to be in the Secretary's analysis. And the Secretary never did that. That's our point. When you're over 100 tons, you have to do an analysis. Never done, we would have been able to tell them how to do the analysis. In the rule, it says you have to use a specific methodology. They never did. They also talked about the fact that they don't believe that we were specific enough in the district court on our standing. Note that we've cited no other evidence in our briefing to you other than what we told the district court. The PORES declaration was in front of the court and exactly what you said, Your Honor, put forth the facts that talked about the fact that it was going to interfere with our attainment plan. And remember that their own EIS admits that the Colorado River Water Delivery Agreement is going to impact the Salton Sea. That's all that we think is needed. Your Honor, I wanted to also raise that in the amicus brief, and I think in our brief as well, we cited two cases, wild fish conservation case and some other cases that talk about the fact that the court can broadly construe the complaint. Remember, there's only two options here for our conformity. It's either an enforcement action, and that's why we brought it in the name of the people, or it's an APA action, and this court can construe it as an APA action. The reason they want our law to be construed as an APA action is because they want to use the arbitrary and capricious. No other Air District rule is enforced in this manner, in the manner that they're proposing. The Air District absolutely can bring forth an action against any entity that's violating its rule. This is a polluter, a regulated part of the community, and the Air District has a right to bring an enforcement action. And if Your Honor makes a different decision, this court, you're going to be saying to 35 Air Districts in California, you can't bring an enforcement action against the federal government, and we think that's a significant problem. One other quick point I want to raise to you is the fact that there would be no challenge to the transfer if there was mitigation. And one of the things that was being said here was that somehow the mitigation measures were all considered in that EIS. They were not. The sale of the salt and sea mitigation water never happened before the EIS. That's a new impact and basically means there's going to be no mitigation to the salt and sea. And finally, Your Honor, on the worst case analysis, the federal defendants are telling you it's 300,000 acre feet. I ask you please to look at Exhibit B of the Colorado River Water Delivery Agreement. We broke it down for you in our Table 2, and it shows you that the impact, the actual reduction, is between 575,000 acre feet a year and 492,000 acre feet a year. And I'd like to leave the rest of my time if possible to Mr. Rossman. Okay. We'll hear from you for just a minute, sir. Thank you, sir. Antonio Rossman for the County of Imperial. I would like to make three quick points. Most of the discussion, of course, has been about air quality in the Air District, but the county is a separate plaintiff and petitioner and appellant here, and our standing under NEPA only is directly before the court. It is Churchill County restated. We did that case 15 years ago. We wrote the same declarations. Secondly, it is remarkable to hear the United States belittle, if you will, the role of the secretary on the Colorado River. I would urge the court to look at two factors, Arizona versus California itself, where the Supreme Court says, and the secretary constantly reminds us, she is the water master of the river. But more particularly, there's just one document in the record that I would ask the court to look at. And I'll give you the citation. It is IAEIS Administrative Record 000931. And my co-counsel has given me the wrong page here. This was a letter from Assistant Secretary Raley to Tom Hannigan, who was then the Director of Water Resources. And the letter makes very clear how the secretary wants this agreement to be done. Would you just give us the citation? It's in the appellant's opening brief, ER-434. And the secretary makes clear that she controls how water is used in the Imperial Irrigation District, and it cannot be used in the Salton Sea except as she decrees. And finally, Your Honors, we've had a discussion about the seven-party agreement. I want to make sure that the court has no misunderstanding that the Yuma is not Yuma, Arizona. The Yuma is a California water district. The table that I've taken here from the government's brief accurately shows on page 12 what this case is all about. 4.4 gets you down to priority 4. The loser, under no action, is the Metropolitan Water District entirely. Imperial Irrigation District, the only way they will lose water is if Palo Verde and Yuma take a disproportionate share of the priorities 1, 2, and 3. That's between them. But the whole rationale why we are here is Metropolitan, under a no action alternative, will lose 500,000 acre feet, which begs the question, if there is to be action, what mitigation should be done? What mitigation should the United States contribute? That's why we're here. Okay. Thank you, Counselor. We appreciate the arguments in this case. This case will stand submitted, and we are now in recess.
judges: Smith, Watford, Hurwitz